**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| )<br>)<br>**MICHAEL MENDOZA,** )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>**UNITED STATES OF AMERICA,** )<br>)<br>Respondent. )<br>)<br>) | CRIMINAL NO. 06-167 |

Opinion

## <u>MEMORANDUM OPINION AND ORDER</u>

**CONTI, District Judge**

Pending before the court is a motion to vacate, set aside, or correct sentence by a person in federal custody pursuant to 28 U.S.C. § 2255 (ECF No. 113) filed by petitioner Michael Mendoza ("Mendoza" or "petitioner"), the government's opposition (ECF No. 117), and petitioner's reply (ECF No. 130). On June 7, 2012, the court held an evidentiary hearing, after which petitioner (ECF No. 150) and the government (ECF No. 151) filed proposed findings of fact and conclusions of law. Upon consideration of the facts and record of this case as well as the submissions of the parties, the court will deny the motion because there was no violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

### I.     <u>Background</u>

On May 5, 2006, petitioner was indicted on one count of conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine in May 2005, and continuing

thereafter until December 2005, in violation of 21 U.S.C. § 846. (ECF No. 11.) A jury found

petitioner guilty and this court entered a judgment against petitioner on December 12, 2007,

imposing a mandatory minimum sentence of imprisonment of 240 months to be followed by ten

years of supervised release. (ECF No. 92.) After petitioner filed a timely appeal, the government

received and provided defense counsel with a Report of Investigation regarding the debriefing of

a confidential informant ("CI") on May 29, 2001 (the "May 29, 2001 Report") authored by a

Drug Enforcement Agency ("DEA") agent as part of the investigation of a separate case. (Tr.

6/7/12 (ECF No. 147) Def. Ex. 4. at 2.) The May 29, 2001 Report was authored by Special Agent

Thomas Jackson, who does not appear to have participated in petitioner's case. (Id. at Def. Ex. 5

at 2.) The May 29, 2001 Report corroborated petitioner's trial testimony that one of his co-

conspirators, Timothy Bill, and a group of other men robbed petitioner of a shipment of

marijuana in approximately January 2000. (Id.)

Petitioner argued on appeal, among other things, that the newly produced evidence was

exculpatory, and that he should be granted an evidentiary hearing or a new trial. United States v.

Mendoza, 334 F. App' x 515, 519 (3d Cir. 2009). The Court of Appeals for the Third Circuit

affirmed the conviction and declined to review petitioner's new evidence argument because this

court did not have an opportunity to review it in the first instance. (Id.) On August 10, 2010,

petitioner proceeded pro se and filed a motion for a new trial pursuant to Rule 33 of the Federal

Rules of Criminal Procedure ("Rule 33 motion"), alleging that the belated disclosure of the May

29, 2001 Report violated Brady. (ECF No. 108.)  On September 28, 2010, petitioner filed a

petition under 28 U.S.C. § 2255 ("§ 2255 Petition") alleging that his trial counsel was ineffective

within the meaning of Strickland v. Washington, 466 U.S. 688 (1984), for failing to file a motion

pursuant to Rule 33 based upon the newly discovered evidence. (ECF No. 113.)

On November 24, 2010, the government filed a joint opposition to petitioner's Rule 33 motion and his § 2255 Petition. (ECF No. 117.) On April 27, 2011, the government filed a second opposition to petitioner's § 2255 Petition. (ECF No. 125.) On February 2, 2012, this court ordered an evidentiary hearing on the pending motions (ECF No. 142), and appointed Elisa A. Long, Esq., a federal public defender, to represent petitioner at that hearing. (ECF No. 135.)

On June 7, 2012, this court held an evidentiary hearing on the pending motions. (ECF No. 145.) At the hearing, petitioner withdrew all his claims except: (1) his Rule 33 motion for a new trial based on the belated disclosure of the May 29, 2001 Report; and (2) the allegation in his § 2255 Petition that trial counsel provided ineffective assistance by failing to file the Rule 33 motion. (Tr. 6/7/12 (ECF No. 147) at 3-4.) The parties were ordered to submit proposed findings of fact and conclusions of law. (Id. at 32.) On August 13, 2012, petitioner and the government filed proposed findings of fact and conclusions of law. (ECF Nos. 150, 151.)

The matter being fully briefed, the court makes the following findings of fact and conclusions of law with respect to whether: (1) the belated disclosure of the May 29, 2001 Report violated Brady; and (2) petitioner's trial counsel failure to file a Rule 33 motion amounted to ineffective assistance under Strickland.

## II.   Standard of Review

### A.   Federal Rule of Criminal Procedure 33

Under Rule 33 of the Federal Rules of Criminal Procedure, the court may grant a defendant's motion for a new trial based on newly discovered evidence "if the interest of justice so requires." FED. R. CRIM. P. 33(a). The defendant bears the burden of proving that a new trial ought to be granted. United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995). "A determination of whether it should grant a new trial is left to the discretion of a district court." United States v.

Quiles, 618 F.3d 383, 390 (3d Cir. 2010) (citing United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006) ("Although the decision to grant or deny a motion for a new trial lies within the discretion of the district court, the movant has a 'heavy burden' of [meeting the requirements].")). A new trial is warranted when the errors, "'when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" United States v. Hoffecker, 530 F.3d 137, 168 (3d Cir. 2008) (quoting United States v. Copple, 24 F.3d 535, 547 n.17 (3d Cir. 1994)).

**B.    Section 2255**

Under § 2255, a federal prisoner in custody may move the court which imposed the sentence to vacate, set aside or correct the sentence

> upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.

28 U.S.C. § 2255(a).  In Hill v. United States, 368 U.S. 424 (1962), the Supreme Court of the United States read § 2255 as stating four grounds upon which relief can be claimed:

> (1) "that the sentence was imposed in violation of the Constitution or laws of the United States," (2) "that the court was without jurisdiction to impose such sentence," (3) "that the sentence was in excess of the maximum authorized by law," and (4) that the sentence "is otherwise subject to collateral attack."

Id. at 426-27 (quoting 28 U.S.C. § 2255(a)).

The statute provides as a remedy for a sentence imposed in violation of law that "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."  28 U.S.C. § 2255(b). For this remedy to be appropriate for a claim of ineffective assistance of counsel, there must be a "showing that counsel made errors so serious that counsel was not functioning as the "counsel"

guaranteed the defendant by the Sixth Amendment." <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). The burden is on the petitioner to establish such a claim and requires a petitioner to prove: (1) deficient representation, meaning that counsel's representation fell below an objective standard of reasonableness, and (2) prejudice, meaning there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Id.</u> at 687, 694.

**III.     Findings of Fact**

1.     Timothy Bill ("Tim") and his brother Daniel Bill ("Dan") (collectively, the "Bills") began dealing drugs in the Pittsburgh area in the mid-1990s.  (Tr. 8/14/07 (ECF No. 98) at 111-12.); (Tr. 8/15/07 (ECF No. 99) at 5.)  Initially, the Bills bought small quantities of marijuana from a friend of Dan's, Darrell Brookins; however, by the late 1990s, the Bills were buying up to 100 pounds of marijuana at a time. (<u>Id.</u> at 7-9.)

2.     Brookins smuggled the marijuana in suitcases from Texas on commercial airplanes arriving at the Pittsburgh International Airport ("PIT"). (<u>Id.</u> at 9-10.)  Tim would sometimes travel to Texas with Brookins to facilitate the transactions. (Tr. 8/14/07 (ECF No. 98) at 117-20.) During one of these trips, Brookins introduced petitioner to Tim as Brookins' Texas marijuana source. (<u>Id.</u>); (Tr. 8/15/07 (ECF No. 99) at 11.)

3.     In late 1997 or early 1998, the Bills began to sell cocaine. (<u>Id.</u> at 13-14.) Tim testified that he would give money to petitioner to purchase marijuana and cocaine. (Tr. 8/14/07 (ECF No. 98) at 120.) Brookins did not want to deal with cocaine for personal reasons; consequently, the Bills would purchase cocaine and it would be concealed in the shipments without the knowledge of Brookins. (Tr. 8/15/07 (ECF No. 99) at 13-14.)

4.      Brookins was caught picking up a shipment of marijuana at PIT and was arrested in early 1998. (Id. at 10.) Once Brookins was arrested, petitioner became the Bills' contact in Texas. (Id.); (Tr. 8/14/07 (ECF No. 98) at 119-20.) The Bills purchased cocaine at nine-ounce intervals at first, but they eventually began buying cocaine in multi-kilogram quantities. (Id. at 120-122.)  Due to the high profitability of cocaine, the Bills shifted their drug trafficking operation to cocaine, but they continued to sell marijuana periodically on a smaller scale. (Id. at 123); (Tr. 8/15/07 (ECF No. 99) at 16.)

5.      For every kilogram of cocaine they sold, the Bills realized a profit of at least $10,000. (Tr. 8/14/07 (ECF No. 98) at 122, 128-29.) The Bills would either personally give petitioner cash for his role in the conspiracy or they would deposit his share of the proceeds into his Citizens Bank account. (Id. at 129-30.)

6.      Dan was arrested in November 1999 for distribution of cocaine when he purchased cocaine from an individual during an undercover sting. (Tr. 8/15/07 (ECF No. 99) at 18-20.) Dan entered a plea of guilty on February 1, 2001, was incarcerated, and was released on parole in June 2002. (Id.)

7.      On April 4, 2002, Pennsylvania State Police Trooper Edward Walker effectuated a search warrant on a suspicious package at the United Parcel Service ("UPS") facility in Pittsburgh, Pennsylvania. (Tr. 8/16/07 (ECF No. 100) at 36-37.) The package had been sent from Dallas, Texas, and was awaiting delivery to a Pittsburgh address. (Id.) The package contained a baby's bib and blanket, two Spanish prayers, and a kilogram of cocaine. (Id. at 39.) The package was resealed and equipped with an electronic device to alert officers when the package was opened. (Id. at 40.)

8.      The DEA executed a controlled delivery of the package at 1534 Hatteras Street in Pittsburgh, Pennsylvania. (Id. at 40.) Officer Walker testified that petitioner accepted the package at the residence and, within a minute, the electronic device alerted officers that the package had been opened. (Id. 40-41.) The officers knocked on the front door, announced themselves, and breached the door when they heard someone running inside the premises. (Id. at 41.) Officers found petitioner on the third floor and the contents of the package on the second floor. (Id. at 41-42.) The cocaine was found under a bed in one room, while the rest of the package was found on the floor of another room. (Id.)

9.      Officer Walker testified that petitioner stated his girlfriend sent him the package and he believed the package contained marijuana; however, petitioner later testified that he never made such claims. (Id. at 42, 52, 129.) When the residence was subsequently searched, officers found approximately three pounds of marijuana. (Id. at 52.)

10.     After his arrest, petitioner remained in the Allegheny County Jail ("ACJ") from April 2002 until February 2005 because he could not post bail. (Id. at 78.)  With petitioner incarcerated, the Bills' drug trafficking operation suffered due to the lack of a profitable cocaine supplier. (Tr. 8/14/07 (ECF No. 98) at 123.)  The Bills began buying cocaine from Clint Davis, a drug dealer whom Dan met while incarcerated, at a higher price than petitioner charged. (Tr. 8/15/07 (ECF No. 99) at 21, 83.)

11.      In February 2005, the Bills bailed petitioner out of the ACJ in order to re-establish their cocaine connection in Texas to obtain a lower price for cocaine. (Id. at 21.)  Dan testified that petitioner, Tim and he "put [their] heads together, tried to figure out where [they] are going to pull some money together so [they could] send [petitioner] down to Texas to bring up cocaine." (Id.) There was no talk of purchasing marijuana because "there is more money to be

made in cocaine." (Id. at 22.) In April or May 2005, petitioner purchased a Chevrolet Cobalt to travel to Texas to purchase cocaine. (Id. at 22.) Petitioner's source of cocaine in Texas was Lourdes Piñeda ("Piñeda"). (Id. at 28); (Tr. 8/14/07 (ECF No. 98) at 132.)

12.      The Bills resumed buying cocaine through petitioner for $17,500 per kilogram. (Id. at 126.) Petitioner made several trips between Texas and Pittsburgh in 2005 transporting the cocaine. (Id. at 127.) By the end of the summer of 2005, petitioner began sending the cocaine through UPS to an abandoned house in Pittsburgh at 1209 High Street. (Tr. 8/15/07 (ECF No. 99) at 30-31, 33-34.) Dan testified that petitioner would call to notify him when the deliveries were arriving. (Id. at 34.) Dan would send money for the cocaine to Texas using UPS. (Id. at 35.) By the end of 2005, the Bills were obtaining up to five kilograms of cocaine per shipment. (Id. at 27-28.)

13.      When petitioner shipped the cocaine, he shrink-wrapped the kilograms of cocaine into brick form, wrapped the bricks with duct tape, and packed them with odor-masking material inside a microwave oven in its original box, which would be sent to the abandoned house at 1209 High Street. (Id. at 33, 36-37.) The packages were stored at a property Dan owned on Spring Garden Avenue in Pittsburgh. (Tr. 8/14/07 (ECF No. 98) at 135.)

14.      On July 13, 2005, petitioner pleaded guilty to possession with intent to deliver cocaine—the charge that resulted from his April 4, 2002 arrest—in the Court of Common Pleas of Allegheny County, for which he was sentenced to time served at the ACJ. (Tr. 8/16/07 (ECF No. 100) at 42, 90.)

15.      By December 2005, the Bills' customers began requesting marijuana, and the Bills decided to procure small quantities of marijuana to sell. (Tr. 8/15/07 (ECF No. 99) at 41-

42.) Petitioner and the Bills agreed that, when petitioner returned to Texas, he would purchase both cocaine and marijuana. (Id. at 96.)

16.     On December 15, 2005, Pittsburgh Police seized approximately 1.3 kilograms of cocaine from a man named Raed Jabber ("Jabber"). (Tr. 8/14/07 (ECF No. 98) at 31.)  Jabber was arrested, confessed, and agreed to assist law enforcement. (Id. at 32.)  Jabber identified the Bills as his cocaine source, who had supplied him cocaine for approximately five months. (Id.) Jabber would purchase the cocaine every ten to fourteen days from 1213 Spring Garden Avenue and 1145 Spring Garden Avenue, residences owned by the Bills. (Id. at 33, 37.)  Jabber informed law enforcement that the Bills would indicate when the cocaine was coming from Texas. (Id. at 37.)

17.     On December 18, 2005, under the surveillance of law enforcement, Jabber purchased one kilogram of cocaine from the Bills. (Id. at 35-36.) Jabber arrived in the Spring Garden Avenue area and was directed by Tim to meet Dan up the street. (Id.) Jabber met Dan, who handed Jabber a kilogram of cocaine worth $27,000 in exchange for his promise to pay for it at a later date. (Id. 36-37.)

18.     On January 3, 2006, under the surveillance of law enforcement, Jabber met Tim on Spring Garden Avenue and handed him a bag containing $27,000 in cash for the cocaine. (Id. at 37.)  During the meetings on December 18, 2005, and January 3, 2006, Tim was driving the Chevrolet Cobalt registered to petitioner. (Id. at 38.)

19.     On January 5, 2006, law enforcement arranged another purchase in order to bust the Bills' drug trafficking operation. (Id. at 39.) Law enforcement deployed surveillance officers near the Spring Garden addresses where Jabber bought cocaine earlier, as well as outside the Reserve Bar and Grill, a restaurant in the Troy Hill neighborhood of Pittsburgh where Jabber was

to meet Tim to accept the cocaine. (Id. at 40.) Law enforcement obtained arrest warrants for the Bills and search warrants for the Chevrolet Cobalt, 1145 Spring Garden Avenue, and 1213 Spring Garden Avenue. (Id. at 39.)

20.     Prior to the bust on January 5, 2006, petitioner pulled up to 1213 Spring Garden Avenue in a Jaguar automobile with a Texas license plate. (Id. at 41.) Petitioner was observed stepping out of the car, entering the apartment complex, exiting, and driving away. (Id. at 41.) Petitioner testified that he was going to the pizza shop in the Spring Garden Avenue address, not the apartment above. (Tr. 8/16/07 (ECF No. 100) at 96.) Because law enforcement was informed the Bills obtained their cocaine from a Texas supplier, a surveillance unit followed petitioner. (Tr. 8/14/07 (ECF No. 98) at 41.)

21.     While Tim and Jabber met inside the Reserve Bar and Grill, Dan left 1145 Spring Garden Avenue and drove to the bar. (Id. at 41.) At the bar, Dan was observed entering Jabber's parked car, immediately reemerging, and driving back to 1145 Spring Garden Avenue. (Id. at 41-42.) Law enforcement confirmed Dan left a kilogram of cocaine in Jabber's car. (Id. at 42.)

22.     Law enforcement arrested the Bills and executed the search warrants for the Spring Garden addresses. (Id.) Law enforcement recovered approximately six kilograms of cocaine, a cocaine press, and paraphernalia for cutting and packaging cocaine from 1213 Spring Garden Avenue. (Id. at 44-45.) At 1145 Spring Garden Avenue, law enforcement recovered $75,000 in cash, a money counter, and Citizens Bank deposit slips, one of which had petitioner's name written on it. (Id. at 57.)

23.     During a subsequent search of the Chevrolet Cobalt, law enforcement agents found a cellphone receipt, an airline ticket receipt in petitioner's name, a receipt and registration for the Cobalt, both in petitioner's name, and a microwave oven. (Id. at 70-73.)

24.     During the searches of the Spring Garden addresses, petitioner was followed to his apartment at 1108 Province Street, Pittsburgh, Pennsylvania, where he walked inside, emerged after a short period of time, and drove away. (Id. at 60.) Law enforcement stopped petitioner after the cocaine and the bank slip with his name written on it were discovered at the Spring Garden addresses. (Id. at 60-61.)

25.     Petitioner cooperated with law enforcement and consented to a search of his apartment at 1108 Province Street in Pittsburgh and his vehicle. (Tr. 8/16/07 (ECF No. 100) at 35-36.) On petitioner's person and in the car, law enforcement found $4,000 in cash, cellphones, a Citizens Bank account card, a Bank of Texas account card, identification, a purchase order for the Jaguar, and a receipt for furniture purchased at Roomful Express. (Tr. 8/14/07 (ECF No. 98) at 61-65.) On the back of the Bank of Texas account card was the name "Lourdes Piñeda," along with a social security number and a date of birth. (Id. at 62.) The purchase order for the Jaguar showed it was purchased by Piñeda and petitioner through Hibernia Bank and provided the address 9017 New Hall Street, Dallas, Texas. (Id. at 63-64.)  At 1108 Province Street, law enforcement found a Citizens Bank checkbook in petitioner's name, a Hibernia Bank payment book in the names of Lourdes Piñeda and petitioner of 9017 New Hall Street, Dallas, Texas, and a deposit slip dated August 17, 2005, in the amount of $2,000. (Id. at 67-68.)  There was no contraband found in petitioner's vehicle or residence. (Id. at 69.)

26.     None of the evidence seized during the January 5, 2006 bust suggested that the Bills or petitioner had been trafficking in marijuana at that time. (Id. at 56-57.)

27.     Petitioner was detained for questioning, but was released after law enforcement agents were unable to "solicit the cooperation of the Bill[s.]" (Id. at 69.)

28.      Five days after their arrests, the Bills agreed to cooperate with law enforcement. (Id. at 139, 153); (Tr. 8/15/07 (ECF No. 99) at 41.) The Bills told law enforcement that petitioner was their cocaine supplier and he was the source of the cocaine seized during the January 5, 2006 bust. (Id. at 40.) The Bills explained that petitioner had been sending up to five kilograms of cocaine at a time to 1209 High Street, an abandoned house in Pittsburgh, in microwave ovens. (Id. at 31-36.) Tim testified his understanding of the benefit he would receive by cooperating with the government would result in "[m]aybe a lighter sentencing." (Tr. 8/14/07 (ECF No. 98) at 139.)

29.      The Bills made recorded telephone calls with petitioner as a part of their cooperation with law enforcement. (Id. at 74-76.) During the phone calls, Dan and petitioner discussed money that was sent to Texas to purchase marijuana. (Tr. 8/15/07 (ECF No. 99) at 53, 55, 57.) The two also discussed getting a "nine," which is a term used in reference to nine ounces of cocaine, but is never used to discuss marijuana. (Tr. 8/16/07 (ECF No. 100) at 160.) Petitioner referenced that he was aware that "six of those things," meaning six kilograms of cocaine, and $50,000 had been seized during the January 5, 2006 bust. (Tr. 8/15/07 (ECF No. 99) at 56.)

30.      Law enforcement reviewed the evidence seized during the January 5, 2006 bust to corroborate what the Bills had told them. The deposit slips seized during the raid confirmed that the Citizens Bank account belonged to petitioner. (Tr. 8/14/07 (ECF No. 98) at 58.) Between March and December 2005, more than $43,000 was deposited into petitioner's Citizens Bank account; all were cash deposits, and all deposits were made at Citizens Bank branches in or near the north side of Pittsburgh, where Dan lived. (Tr. 8/15/07 (ECF No. 99) at 128-30.)  Once the

Bills were arrested, petitioner's Citizens Bank account was overdrawn and there were no further deposits made into the account after December 7, 2005. (Id. at 130.)

31.     A review of the records from the cellphones seized from petitioner's Jaguar showed that between October 25, 2005 and January 16, 2006, the Bills and petitioner communicated daily and that the only Texas phone number in Tim's phone during December 2005 was petitioner's number. (Tr. 8/15/07 (ECF No. 99) at 118); (8/16/07 (ECF No. 100) at 159.)

32.     The cellphone and bank records indicated that petitioner had made trips consistent with a trip from Pittsburgh to Texas. (Tr. 8/15/07 (ECF No. 99) at 119.) The bank records of petitioner revealed that, during the charged conspiracy, there were numerous hotel, car rental and airfare purchases in both Pittsburgh and Dallas. (Id. at 124.) The purchases made on petitioner's Citizens Bank debit card indicate that he made purchases on a highway route consistent with a trip from Pittsburgh to Dallas. (Id. at 125); (Tr. 8/16/07 (ECF No. 100) at 23-26.)

33.     The microwaves that were turned over to law enforcement were bought at a Wal-Mart store located 2.56 miles away from 9017 New Hall Street, Dallas, Texas. (Tr. 8/15/07 (ECF No. 99) at 140.) On August 9, 2005, a few days prior to the first cocaine shipment to 1209 High Street in Pittsburgh, petitioner's bank records showed a purchase at that Wal-Mart store in Dallas, Texas. (Id. at 141.) Comparing the weight of an empty microwave oven, approximately twenty-five pounds, with the reported weight of the shipments to 1209 High Street, which weighed up to thirty-six pounds, revealed that approximately eleven pounds — up to five kilograms — of extra material was inside. (Id. at 141.)

34.     On May 2, 2006, based upon the evidence obtained during the January 5, 2006 bust and the recorded phone calls, an arrest warrant was issued for petitioner. (Tr. 8/14/07 (ECF

No. 98) at 77-78.) Petitioner was arrested when he returned to Pittsburgh that day to retrieve the Jaguar and $4,000 that were seized from him during the January 5, 2006 bust. (Id.)

35.     After being read his <u>Miranda</u> rights, petitioner admitted he supplied cocaine to the Bills and was willing to cooperate with law enforcement by assisting in apprehending additional individuals in the Pittsburgh area. (Tr. 8/15/07 (ECF No. 99) at 143-44.) Petitioner made no reference to trafficking marijuana during his arrest on May 2, 2006. (Tr. 8/16/07 (ECF No. 100) at 160.)

36.     On August 13, 2007, Mendoza went to trial on the charge against him. During closing argument the prosecutor commented on the testimony of Mendoza about his experience of being robbed of marijuana in 1999, and his belief that Tim was involved. The prosecutor, among other things, argued:

> What did the defendant tell us? . . . [H]e stated he was robbed by a Dominican at gunpoint. He stated that he was introduced to this Dominican by Timothy Bill, who immediately left the scene and then he immediately gets robbed.
>
> Now, only two scenarios can be true about this alleged robbery. One. Timothy Bill knew that he was going to be robbed. Or, two, Timothy Bill didn't know that he was going to be robbed. And I would submit to you that either scenario makes absolutely no sense.

(Tr. 8/20/07 (ECF No. 101) at 74-75.) The court instructed the jury about the appropriate weight to be given to the arguments of counsel, and specified that "[t]hey are not evidence . . . If any argument, statement, remark or question of the attorney has no basis in the evidence, then you should disregard that particular argument, statement remark or question." (Id. at 14.)

37.     After a five-day trial, the jury convicted petitioner of conspiring with others to distribute and possess with intent to distribute five kilograms or more of cocaine between May and December 2005. (ECF No. 83.) On December 10, 2007, Mendoza was sentenced to the statutory mandatory minimum sentence of 240 months.  (ECF No. 92.)

38.     After petitioner filed a notice of appeal, a DEA agent, who had worked on

petitioner's case, discovered the May 29, 2001 Report, which discussed the debriefing of a CI

who detailed a robbery involving petitioner and Tim that took place in approximately January

2000. (Tr. 6/7/12 (ECF No. 147) Def. Ex. 4 at 2.) The DEA agent found the report while

researching another case. (Id.) The May 29, 2001 Report was not discovered earlier because its

contents had been related by a different CI and was filed under the name of an individual that

had no known connection to the cocaine conspiracy for which petitioner was prosecuted. (Id.)

The May 29, 2001 Report was not prepared by any individual involved in petitioner's case. (Tr.

6/7/12 (ECF No. 147) Def. Ex. 5.)

39.     In the May 29, 2001 Report, the CI stated that Tim was his primary cocaine and

marijuana customer between 1998 and 2000. (Id. at 1.)  Tim purchased one kilogram of cocaine

approximately every two months and multiple pounds of marijuana. (Id.) In the winter of 1999,

Tim "developed an additional marijuana source identified as Michael Mendoza." (Id.)

40.     The May 29, 2001 Report disclosed that the CI and another individual, Jeffery

Cancilla ("Cancilla"), robbed petitioner of seventy pounds of marijuana. (Id. at 2.)  The CI stated

that Tim and he decided to steal petitioner's marijuana. (Id.) Tim picked up petitioner and the

marijuana at a hotel outside of Pittsburgh and drove to meet the CI and Cancilla on the North

Side of Pittsburgh. (Id.) Petitioner entered the CI's vehicle, which was driven to a secluded area,

where the CI brandished a weapon and ordered petitioner out of the car. (Id.) After the robbery,

Tim received ten pounds of marijuana from the CI "for arranging the incident." (Id.)

41.     The May 29, 2001 Report also detailed Tim's involvement in transporting four

kilograms of cocaine with the CI in March 2000. (Id.) The CI was transporting the cocaine to

Pittsburgh from San Antonio, Texas, when he was pulled over by Missouri State Troopers. (Id.) The CI fled and buried the four kilograms of cocaine in a wooded area. (Id.) Tim drove to Missouri to recover the buried cocaine and help transport it back to Pittsburgh. (Id. at 2-3.) Tim received a kilogram of cocaine for his assistance. (Id. at 3.)

42.    The May 29, 2001 Report referred to a Report of Investigation dated February 15, 2001 (the "February 15, 2001 Report") regarding the "Mendoza Robbery." (Id.) The February 15, 2001 Report corroborated the statements in the May 29, 2001 Report regarding Tim's involvement in the robbery and transporting four kilograms of cocaine to Pittsburgh with the CI. (Tr. 6/7/12 (ECF No. 147) Def. Ex. 6 at 6.) The February 15, 2001 Report revealed that the CI was a cocaine and marijuana supplier to Tim in 2000. (Id. at 5, 7, 10.) It also revealed that Cancilla supplied Tim with cocaine at least once during 2000. (Id. at 8.)

**IV.    Procedural History of *Brady* Claim**

1.    The government believed that Brady did not require disclosure of the May 29, 2001 Report because "the alleged incident [in the May 29, 2001 Report] occurred long before the charged conspiracy even began [and] Mendoza knew of the incident." (Tr. 6/7/12 (ECF No. 147) Def. Ex. 6 at 2.)

2.    Mendoza's trial attorney attempted to raise the Brady issue on direct appeal. Mendoza, 334 F. App'x at 519. The Court of Appeals for the Third Circuit affirmed Mendoza's conviction and declined to review the Brady argument until this court reviewed the newly discovered evidence in the first instance. (Id.)

3.    On August 10, 2010, proceeding pro se, Mendoza filed a motion for a new trial under Rule 33 based upon newly discovered evidence. (ECF No. 108.) The Rule 33 motion sought a new trial due to the government's failure to disclose Brady material. (Id. at 2-3.)

4.    On September 28, 2010, Mendoza filed a motion for a New Trial Under Rule 33 Newly Discovered Evidence and Title 28 U.S.C. § 2255. (ECF No. 113.)  The § 2255 Petition alleged ineffective assistance of counsel by Ms. Frick within the meaning of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), because she failed to file a Rule 33 motion with this court in an effort to seek relief for the government's failure to disclose <u>Brady</u> material. (ECF No. 113 at 5-6.)

5.    The government filed an opposition to petitioner's Rule 33 motion and his § 2255 Petition. (ECF Nos. 117, 125.)

6.    On February 1, 2012, this court ordered an evidentiary hearing. (ECF No. 132.) Elisa A. Long, Esq., a federal public defender, was appointed to represent petitioner at the evidentiary hearing. (ECF No. 135.)

7.    Eight days before the evidentiary hearing, at petitioner's request, the government turned over a copy of the February 15, 2001 Report. (Tr. 6/7/12 (ECF No. 147) at 5-6.)

8.    On June 7, 2012, this court held an evidentiary hearing on the pending motions. Petitioner withdrew all his claims except (1) his Rule 33 motion for a new trial based on the government's belated disclosure of the May 29, 2001 Report, and (2) his allegation in his § 2255 Petition that Ms. Frick had rendered ineffective assistance by failing to file the Rule 33 motion. (Tr. 6/7/12 (ECF No. 147) at 3.)

9.    Ms. Frick testified that none of the government's disclosures prior to the May 29, 2001 Report indicated any type of betrayal by Tim of petitioner. (<u>Id.</u>) Ms. Frick received the May 29, 2001 Report on October 2, 2008, after the notice of appeal had been filed. (<u>Id.</u> at 11-12.) Ms. Frick attempted to raise the Rule 33 issue with the Court of Appeals since it was her

understanding that this court did not have jurisdiction over petitioner's case while the appeal was pending. (Id. at 13.)

10. The May 29, 2001 Report and February 15, 2001 Report (the "2001 DEA Reports") corroborated petitioner's trial testimony that, in the late 1990s, he was robbed of a shipment of marijuana by men whom he suspected were working with Tim. (Tr. 8/16/07 (ECF No. 100) at 67-70.)

11. Ms. Frick testified that she would have mainly used the 2001 DEA Reports to attack Tim's credibility and his bias. (Id. at 17.) Because the Bills worked closely together, Ms. Frick testified she could have questioned Dan about his involvement in the robbery. (Id. at 18, 22.) Ms. Frick could not have used the reports to impeach Detective Veinovich's testimony about the inculpatory statement petitioner made during his arrest concerning his dealing cocaine with the Bills in 2005 and 2006. (Id. at 24-25.)

12. Ms. Frick testified, if she had the 2001 DEA Reports prior to trial, she could have conducted additional investigations and could have requested additional discovery from the government to further her efforts. (Id. at 19.)

V. **Conclusions of Law**

A. **The *Brady* Claim**

1. In Brady, the Supreme Court held "that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused; accordingly, when "evidence is so clearly supportive

of a claim of innocence" the prosecution has a duty to disclose. United States v. Agurs, 427 U.S. 97, 107 (1976).

2.    To establish a Brady violation, a defendant must show: "(1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or [had] impeachment value; and (3) the withheld evidence was material." Lambert v. Blackwell, 387 F.3d 210, 252 (3d Cir. 2004) (citing Banks v. Dretke, 540 U.S. 668, 691 (2004)); United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991). Evidence withheld by the prosecution "must be evaluated in the context of the entire record." Agurs, 427 U.S. at 112.

3.    The prosecution's duty to disclose under Brady goes beyond evidence that the prosecution actually possesses. United States v. Risha, 445 F.3d 298, 303 (3d Cir. 2006). Under Brady, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," and to disclose the evidence to the defense. Kyles v. Whitley, 514 U.S. 419, 437 (1995). There is no "'distinction between different agencies under the same government.'" Perdomo, 929 F.2d at 970 (quoting United States v. Antone, 603 F.2d 566 (5th Cir. 1979)). The focus in determining if the government is in possession of Brady material is upon the "'prosecution team,' which includes both investigative and prosecutorial personnel." Id.

4.    The "prosecution is only obligated to disclose information known to others acting on the government's behalf in a particular case. . . ." United States v. Pelullo, 399 F.3d 197, 218 (3d Cir. 2005). The Court of Appeals for the Third Circuit cited United States v. Locascio, 6 F.3d 924 (2d Cir. 1993), as support for that conclusion. In Locascio, the Court of Appeals for the Second Circuit held that there was no Brady violation in a case where prosecutors did not

disclose an FBI report prepared by investigators in an unrelated prosecution. 6 F.3d at 948. The

FBI report could have been used as impeachment evidence. The FBI report was reviewed by the

United States Attorney after the defendants were sentenced. Id. Agents that were not part of the

"prosecution team" of the defendants' case prepared the FBI report, which was discovered

during the investigation of other organized criminal activity involving the same government

witness. Id. The court held that the government did not suppress impeachment evidence because

the court "w[ould] not infer the prosecutor's knowledge simply because some other government

agents knew about the reports." Id. at 949; see United States v. Avellino, 136 F.3d 249, 255 (2d

Cir. 1998) ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not

working with the prosecutor's office on the case in question would inappropriately require us to

adopt a 'monolithic view of government' that would 'condemn the prosecution of criminal cases

to a state of paralysis.'") (citation omitted).

5.      Petitioner argues that the 2001 DEA Reports were prepared by the DEA, which

was the lead investigative agency in his case; thus, the government had knowledge of the reports

because the DEA was a part of the same "prosecution team." Because the prosecution team

possessed such knowledge, petitioner maintains the government inadvertently failed to disclose

the 2001 DEA Reports to the defense. (Tr. 6/7/12 (ECF No. 147) at 5.)

6.      Assuming that the May 29, 2001 Report was Brady material, Special Agent Pritts

only discovered it while researching another case. (Tr. 6/7/12 (ECF No. 147) Def. Ex. 4 at 2.).

The report was not discovered sooner because its contents were associated with a CI who did not

assist the government in the development of the cocaine-conspiracy case against petitioner and it

was filed under the name of a man who had no known connection to petitioner. (Id.) Also, agents

that were not involved in the prosecution of petitioner prepared the 2001 DEA Reports. (Id. at

23.) The prosecution team did not include the agents who prepared the 2001 DEA Reports. Akin to Locasico, the "prosecution team" in petitioner's case did not suppress potential Brady material; accordingly, the court finds the government did not suppress Brady material.

7.      Even if the prosecution had included the agents who prepared the 2001 DEA Reports, the reports are not considered favorable as contemplated by Brady.  They would not "tend to exculpate [the defendant]," Brady, 373 U.S. at 87-88, or "alter the jury's judgment of the credibility of a crucial prosecution witness." United States v. Higgs, 713 F.2d 39, 42 (3d Cir. 1983) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)).  Exculpatory and impeachment evidence falls under Brady because "[s]uch evidence is evidence favorable to an accused." Lambert, 387 F.3d at 252. The Court of Appeals for the Third Circuit has held that evidence about co-conspirators' conduct during a prior drug-trafficking conspiracy is not Brady material where it "does not negate" a co-conspirator's testimony that the defendant had joined them in a latter drug conspiracy. United States v. Boone, 279 F.3d 163, 190-91(3d Cir. 2002); see United States v. Gagliardi, 285 F. App'x 11, 15 (3d Cir. 2008) (evidence that a defendant was involved in a prior drug transaction is not exculpatory because such evidence "can hardly be considered 'favorable.'"). Evidence is not considered Brady material when "it did not contradict any evidence offered by the prosecution, and was largely cumulative." Agurs, 427 U.S. at 113-114.

8.      Petitioner argues the evidence in the reports is favorable because it would have altered the jury's judgment of the bias and credibility of the Bills, which his trial attorney characterized as "the heart of the government's case." (Tr. 6/7/12 (ECF No. 147) at 17.) Petitioner contends the 2001 DEA Reports had impeachment value because (1) they indicated that Tim arranged to have Mendoza robbed at gunpoint (Id. at Def. Ex. 5, 6); (2) it corroborates petitioner's testimony that he was a marijuana source and not a cocaine source (ECF No. 112 at

12); and (3) they revealed the benefit the Bills received from their cooperation with the government.

9.     Here, the information contained in the 2001 DEA Reports cannot be considered exculpatory. The 2001 DEA Reports implicate petitioner in other large-scale marijuana drug-trafficking activities.  As the Court of Appeals for the Third Circuit has ruled, evidence that a defendant was involved in prior drug transactions "can hardly be considered 'favorable.'" Gagliardi, 285 F. App'x at 15.

10.     Furthermore, the 2001 DEA Reports do not contradict any evidence presented by the government and the pertinent contents were cumulative of evidence the jury already heard. Specifically, petitioner testified that he was robbed in January 2000 and suspected Tim was involved. (Tr. 8/16/07 (ECF No. 100) at 67-70.)

11.     Petitioner argues that the 2001 DEA Reports contradict the Bills' testimony that he was their cocaine source. The May 29, 2001 Report and the February 15, 2001 Report did in fact show that the Bills had multiple cocaine and marijuana sources. (Tr. 6/7/12 (ECF No. 147) Def. Ex. 5, 6.) The jury, however, heard evidence that both Tim and Dan were involved in several other drug conspiracies before and during the charged conspiracy with other drug dealers such as Brookins, Jabber and Davis. (Tr. 8/15/07 (ECF No. 99) at 83-85); (Tr. 8/16/07 (ECF No. 100) at 63, 74.) The 2001 DEA Reports dealt strictly with a marijuana conspiracy that occurred five years before the charged conspiracy. Both Tim and Dan testified that they were involved in a separate 1999-2000 marijuana conspiracy with the petitioner. (Tr. 8/14/07 (ECF No. 98) a 10-11); (Tr. 8/15/07 (ECF No. 99) at 119-20.) From this evidence, the jury could have easily inferred that the Bills obtained drugs from other sources, as well. There is nothing in the 2001

DEA Reports that contradicts the Bills' testimony that petitioner was involved in the charged conspiracy in 2005.

12.     To the extent that the 2001 DEA Reports could harm the Bills' credibility, the jury knew that the Bills betrayed petitioner in this case. At trial, the jury heard testimony that, in exchange for favorable consideration at sentencing, the Bills agreed to cooperate with the government. (Tr. 8/14/07 (ECF No. 98) at 139.)  Both Tim and Dan agreed to make recorded phone calls with petitioner to build a case against him and both testified against petitioner at trial. (Id. at 164-65); (Tr. 8/15/07 (ECF No. 99) at 95.) The 2001 DEA Reports show there was an additional event in which Tim betrayed petitioner.

13.     The 2001 DEA Reports were likewise not "material" for Brady purposes because there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985).   When a defendant's guilt is "fully and powerfully corroborated" by other evidence in the record, the alleged Brady material is "neither essential to [his] defense nor material evidence warranting a new trial." United States v. Perez, 280 F.3d 318, 350 (3d Cir. 2002). Petitioner does not have to "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Kyles, 514 U.S. at 434-35. Petitioner instead needs only to establish that the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in its verdict." Smith v. Holtz, 210 F.3d 186, 198 (3d Cir. 2000).

14.     Neither the May 29, 2001 Report or the February 15, 2001 Report support petitioner's defense that he dealt exclusively in marijuana and not in cocaine. The 2001 DEA

Reports detailed drug-trafficking incidents involving the petitioner and his co-conspirators that occurred at least five years prior to the charged conspiracy. (Tr. 6/7/12 (ECF No. 147) at 25.) The May 29, 2001 Report and the February 15, 2001 Report show that petitioner dealt in marijuana from the late 1990s to the early 2000s. The 2001 DEA Reports do not explicitly exonerate petitioner from any cocaine-trafficking activities. (Id. at Def. Ex. 5, 6.)

15.    The 2001 DEA Reports do not overcome the evidence the government introduced such that they would warrant a new trial. None of the evidence that was seized during the January 5, 2006 bust suggested that the petitioner was only involved in trafficking marijuana at that time. (Tr. 8/14/07 (ECF No. 98) at 56-57.) Petitioner's bank records show that during the time period of the charged conspiracy more than $43,000 was deposited into petitioner's bank account; however, once the Bills were arrested, no further deposits were made and the account became overdrawn. (Tr. 8/15/07 (ECF No. 99) at 128-30.) The microwave ovens that were used to send the cocaine through UPS were purchased from a Wal-Mart store located 2.56 miles away from petitioner's address in Texas. (Id. at 140.) A few days before a cocaine shipment, petitioner's bank records showed a purchase at that Wal-Mart store. (Id. at 141.) The bank and cell phone records indicated that petitioner made trips consistent with a trip from Pittsburgh to Dallas during the charged conspiracy. (Tr. 8/15/07 (ECF No. 99) at 119, 124-35); (Tr. 8/16/07 (ECF No. 100) at 23-26.)

16.    Petitioner argues that the 2001 DEA Reports vindicate him from the charged conspiracy because it shows that he dealt marijuana and that he "never" dealt cocaine. (Tr. 8/16/07 (ECF No. 100) at 73.) The reports, however, do not contradict petitioner's 2005 guilty plea to trafficking cocaine in 2002. (Tr. 8/16/07 (ECF No. 100) at 42.)

17.    Petitioner argues that the failure to turn over the 2001 DEA Reports prevented him from responding to the prosecutor's closing argument which called into question the veracity of petitioner's testimony about the 1999 robbery. To the extent that this failure was an error, however, it is not sufficient to undermine confidence in the verdict in light of the overwhelming amount of evidence of petitioner's guilt, including his confession. Perez, 280 F.3d at 350.

18.    The 2001 DEA Reports were not prepared by DEA agents that were involved in the prosecution of petitioner in this case, and they do not mention the multiple government witnesses that implicated the petitioner as a vital member of the charged conspiracy between May and December 2005. At the evidentiary hearing, Ms. Frick admitted the reports would not have been useful in impeaching the testimony of Dan and Veinovich. (Tr. 6/7/12 (ECF No. 147) at 22-23.) Consequently, even if the reports could have been used to impeach Tim's testimony, they would not have been useful in impeaching Dan's testimony that petitioner supplied them cocaine during the period of the charged conspiracy. More importantly, the 2001 DEA Reports would not have had any impact on petitioner's post-arrest confession to DEA Task Force Officer Veinovich that petitioner had been supplying the Bills with cocaine during the period of the charged conspiracy and that he was willing to cooperate with law enforcement by assisting in apprehending additional individuals in the Pittsburgh area. (Tr. 8/15/07 (ECF No. 99) at 143-44.) During that confession petitioner made no reference to trafficking marijuana. (Tr. 8/16/07 (ECF No. 100) at 160.)

19.    For the foregoing reasons, the court concludes that the contents of the 2001 DEA Reports are not "favorable" or "material" for Brady purposes.  The reports detail an incident that occurred years before the charged conspiracy and do not overcome the substantial evidence

presented by the government, particularly in light of the testimony by Dan and Officer Veinovich – neither whom were discussed in the reports or had anything to do with their creation. (Tr. 6/7/12 (ECF No. 147) at 22-23.) This court cannot find that the May 29, 2001 Report and the February 15, 2001 Report constituted Brady material. Petitioner's Rule 33 motion (ECF No. 108) will therefore be DENIED.

**B.    The *Strickland* Claim**

20.    Petitioner argues in his § 2255 Petition that his trial attorney's failure to file a Rule 33 motion with this court, instead of the court of appeals, on his behalf after she was informed of the 2001 DEA Reports in October 2008 constituted ineffective assistance of counsel under the test set forth in Strickland. (Doc Nos. 112-13.) The court concludes that this claim is meritless.

21.    To support a claim that "counsel's assistance was so defective as to require reversal of a conviction," Strickland, 466 U.S. at 687, petitioner must make two showings. "[A] habeas petitioner claiming a deprivation of his or her Sixth Amendment right to effective assistance of counsel must show that: (1) counsel's performance was deficient; and (2) counsel's deficient performance caused the petitioner prejudice." Ross v. Dist. Att'y of the Cnty. of Allegheny, 672 F.3d 198, 210 (3d Cir. 2012) (citing Strickland, 466 U.S. at 687). The United States Court of Appeals for the Third Circuit has directed district courts to address the prejudice prong of the analysis first. See McAleese v. Mazurkiewicz, 1 F.3d 159, 170 (3d Cir. 1993), cert. denied, 510 U.S. 1028 (1993) ("Indeed, this Court has read Strickland as requiring the courts to decide first whether the assumed deficient conduct of counsel prejudiced the defendant.") (internal quotations and citations omitted). The court of appeals in McAleese quoted the Court in Strickland as follows:

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

McAleese, 1 F.3d at 171 (quoting Strickland, 466 U.S. at 697). Because the court concludes that petitioner did not suffer prejudice, it is not necessary to determine whether counsel's performance was deficient.

22.     To establish prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . [rather] the defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693-94; see also Williams v. Taylor, 529 U.S. 362, 391 (2000). The standard for Strickland prejudice "finds its roots in the test of materiality." Strickland, 466 U.S. at 694; see also Kyles, 514 U.S. at 434.

23.     As discussed above, there is no reasonable probability that the disclosures of the 2001 DEA Reports, in light of the whole record, would have changed the outcome of the proceedings for purposes of Strickland prejudice or could undermine confidence in the verdict. The 2001 DEA Reports do not impeach Officer's Veinovich's testimony that, after his arrest in May 2006, petitioner admitted that he was a cocaine source for the Bills during the charged conspiracy in 2005. (Tr. 8/15/07 (ECF No. 99) at 143-44.) The 2001 DEA Reports never mentioned Dan; thus, they could not have been used to contradict his testimony that petitioner was the Bills' cocaine source. (Id. at 40.) Consequently, Dan's and Officer Veinovich's testimony corroborates Tim's testimony that petitioner was a vital member in the 2005 cocaine-trafficking conspiracy. Petitioner is adamant that the 2001 DEA Reports show that he exclusively

dealt in marijuana; however, the reports do not contradict petitioner's 2005 guilty plea to trafficking cocaine in 2002. (Tr. 8/16/07 (ECF No. 100) at 42.)  Furthermore, the evidence seized during the January 5, 2006 bust corroborates the Bills' testimony that petitioner was a vital member in the 2005 cocaine-trafficking conspiracy. (Tr. 8/14/07 (ECF NO. 98) at 56-57.)

24.      For the foregoing reasons, the court concludes that for the same reasons the 2001 DEA Reports were not "material" within the meaning of <u>Brady</u>, Ms. Frick's failure to raise the <u>Brady</u> issue with this court was not prejudicial within the meaning of <u>Strickland</u>. Petitioner's § 2255 Petition (ECF No. 113) will therefore be DENIED.

## VI.     <u>Certificate of Appealability</u>

When a district court issues a final order denying a § 2255 petition, the court must also make a determination concerning whether a certificate of appealability ("COA") should issue or the clerk of the court of appeals shall remand the case to the district court for a prompt determination as to whether a certificate should issue. <u>See</u> 3rd Cir. LAR. 22.2 (2002). Based upon the motion and files and records of the case, and for the reasons set forth herein, the court finds that petitioner has not shown a substantial denial of a constitutional right. Therefore, a COA should not be issued.

## VII.    <u>Order</u>

AND NOW, This 6th day of August, 2013, upon consideration of petitioner's motion to vacate, set aside, or correct sentence by a person in federal custody, the government's response in opposition, the evidence presented at the hearing on June 7, 2012, and the supplemental briefs submitted by the parties, IT IS HEREBY ORDERED that petitioner's motion to vacate, set aside, or correct sentence by a person in federal custody pursuant to 28 U.S.C. § 2255 (ECF No. 113) is DENIED in its entirety.

IT IS FURTHER ORDERED that petitioner's motion for a new trial pursuant to Federal

Rule of Criminal Procedure 33 (ECF No. 108) is DENIED.

IT IS FURTHER ORDERED that no certificate of appealability should be issued.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge